654 F.Supp. 1318 (1987)
CONSOLIDATED RAIL CORPORATION, Plaintiff,
and
United States of America and United States Railway Association, Intervenors,
v.
READING COMPANY; Carl Scholing, on behalf of himself, and all others similarly situated; and Woodrow W. Schwambach, on behalf of himself and all others similarly situated, Defendants.
CONSOLIDATED RAIL CORPORATION, United States Railway Association, and United States of America, Plaintiffs,
v.
ERIE LACKAWANNA, INC., Floyd Patrick, et al., Defendants.
Francis PUISHIS, Executor of the Estate of Anthony J. Puishis, Phillip Angello and John C. Henning, Plaintiffs,
v.
NATIONAL RAILROAD PASSENGER CORPORATION and Consolidated Rail Corporation, Defendants.
Civ. A. Nos. 82-29, 84-9 and 85-2.
Special Court, Regional Rail Reorganization Act.
January 27, 1987.
*1319 *1320 Laurence Z. Shiekman, M. Duncan Grant, Patricia H. Burrall, Mary Beth Clark, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Bruce B. Wilson, Donald A. Brinkworth, Philadelphia, Pa., for Consolidated Rail Corp.
Christopher M. Klein, John C. Morland, Washington, D.C., for National R.R. Passenger Corp.
Richard K. Willard, Asst. Atty. Gen., Michael F. Hertz, Alan E. Kleinburd, U.S. Dept. of Justice, Washington, D.C., and Frazer C. Hilder, U.S. Ry. Ass'n, Washington, D.C., for U.S. and U.S. Ry. Ass'n.
Harry G. Silleck, Jr., Howard W. Goldstein, James Niss, Adrian von Hassel, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Erie Lackawanna, Inc.
Howard H. Lewis, Timothy I. McCann, Sprecher, Felix, Visco, Hutchinson & Young, Philadelphia, Pa., for Reading Co.
Alan L. Krumholz, Pearlman, Krumholz, Horn & Shechtman, Jersey City, N.J., for Floyd Patrick, et al.
Joseph F. Rice, James H. Rion, Jr., Blatt & Fales, Barnwell, S.C., Richard H. Middleton, Middleton & Anderson, Savannah, Ga., for Carl Scholing and Woodrow W. Schwambach.
Robert J.F. Brobyn, Raymond P. Forceno, Brobyn & Forceno, Philadelphia, Pa., for Francis Puishis, et al.
Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

MEMORANDUM
BRYANT, Judge:

I. Introduction

These actions are brought pursuant to the Regional Rail Reorganization Act of 1973 ("Rail Act" or "3R Act"), 45 U.S.C. § 701 et seq., as amended by the Northeast Rail Service Act of 1981 ("NRSA"), 45 U.S.C. § 1101 et seq. All the cases stem from personal injury suits commenced by various longtime railroad employees, or their representatives, in federal and state courts under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq., in which damages are sought for injuries or death allegedly sustained as a result of *1321 exposure to asbestos while employed by the bankrupt railroads which transferred the bulk of their rail properties to Conrail and others pursuant to section 303(b) of the Rail Act.
In each of the cases in this court plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, on the same issue, i.e., the effect of the Rail Act upon the aforementioned FELA claims. More specifically, the issue is whether § 709(b) of the Act furnishes grounds for recovery of damages against Conrail and/or Amtrak, or instead, erects a permanent barrier against recovery from them, either under the Act or any other authority.
The cases were previously consolidated for the purpose of hearing motions and are now before the court on cross-motions for summary judgment. The procedural backgrounds of the cases differ, and it is helpful to examine the routes which have brought them to their current common ground.

II. Procedural Background

A. Conrail, et al. v. Reading Co., et al., C.A. No. 82-29
This action was brought by Conrail in December 1982 against the Reading Co. ("Reading") and two former Reading employees. Reading, whose rail properties were conveyed to Conrail in 1976, was discharged in bankruptcy in 1980. Both individual defendants, Woodrow W. Schwambach, who was subsequently employed by Conrail, and Carl Scholing, who was not hired by Conrail, are among several who have filed FELA actions against Conrail and Reading in the United States District Court for the Eastern District of Pennsylvania, for asbestos-related injuries allegedly sustained while they were employed by Reading. On April 13, 1984 this court granted the motions of the United States and the United States Railway Association ("USRA") for leave to intervene as plaintiffs. All parties have moved for summary judgment.

B. Conrail, et al. v. Erie Lackawanna, Inc., et al., C.A. No. 84-9
In October 1984 Conrail commenced this suit against Erie Lackawanna ("Erie") and nine former railroad employees. The individual defendants had worked for either Erie, Lehigh Valley Railroad Co. ("Lehigh Valley") or Penn Central Transportation Co., ("Penn Central") prior to being employed by Conrail. Erie, Lehigh Valley and Penn Central conveyed their rail properties to Conrail in 1976 and their reorganization plans have since been consummated. Thereafter, the nine individual defendants in this case filed FELA suits against Conrail in New Jersey state courts in which they assert that Conrail is liable, as a successor corporation to the bankrupt railroads, for injuries that stemmed from their employment with Conrail's predecessors. On November 28, 1984 this court granted the United States and the USRA leave to intervene as plaintiffs. The parties have moved for summary judgment.

C. Puishis, et al. v. Amtrak and Conrail, C.A. No. 85-2
Three individuals brought this action in January 1985 against Conrail and Amtrak. One plaintiff had worked for Penn Central and seeks relief from Conrail; another had worked for Erie and Conrail and is seeking relief against Conrail; a third plaintiff had worked for Penn Central and seeks relief from Amtrak. Plaintiffs here seek a declaratory judgment that, pursuant to provisions of the Rail Act, Conrail and Amtrak are obligated to assume, process, and pay the claims for asbestos-related injuries arising from plaintiffs' employment with Conrail's and Amtrak's predecessors. On June 13, 1985 this court granted Erie's motion to intervene as a defendant. All parties have now moved for summary judgment.
On March 18, 1985 this court entered an order which stayed trial of the FELA actions pending in other courts.

III. Liability Under Section 709(b) of the Rail Act

All three cases turn on the current applicability and the effect of § 709(b) of the *1322 Rail Act, as amended, 45 U.S.C. § 797h(b), and § 211(h)(1) of the Act, 45 U.S.C. § 721(h)(1).[1]
Section 709(b) states:
ASSUMPTION OF PERSONAL INJURY CLAIMS.All cases or claims by employees or their personal representatives for personal injuries or death against a railroad in reorganization in the Region arising prior to the date of conveyance of rail properties, pursuant to section 303 of this Act, [45 U.S.C. § 743] shall be assumed by the Corporation or an acquiring railroad, as the case may be. The Corporation or the acquiring railroad shall process and pay any such claims that are sustained or settled, and shall be entitled to direct reimbursement from the Association pursuant to section 211(h) of this Act [45 U.S.C. § 721(h)], to the extent that such claims are determined by the Association or its successor authority to be the obligation of such railroad. Any liability of an estate of a railroad in reorganization which is assumed, processed, and paid, pursuant to this subsection, by the Corporation or an acquiring railroad shall remain the preconveyance obligation of the estate of such railroad for purposes of section 211(h)(1) [45 U.S.C. § 721(h)(1)], of this Act. The Corporation, an acquiring railroad, or the Association, as the case may be, shall be entitled to a direct claim as a current expense of administration, in accordance with the provisions of section 211(h) of this Act [45 U.S.C. § 721] (other than paragraph (4)(A) thereof), for reimbursement (including costs and expenses of processing such claims) from the estate of the railroad in reorganization on which behalf such obligations were discharged or paid.
In brief, Conrail, Amtrak, the United States and the USRA assert that both the language and the legislative history of § 709(b) preclude liability under that section for the tort claims brought by the individual defendants in C.A. Nos. 82-29 and 84-9 and the plaintiffs in C.A. No. 85-2 ("the employee claimants"). Alternatively, Conrail contends that if this court determines that it is liable under § 709(b) the court should also hold that it is entitled to automatic reimbursement for any claims sustained against it, pursuant to § 709(b) and § 211(h)(1) of the Rail Act, 45 U.S.C. §§ 797h(b) and 721(h)(1). Section 211(h)(1) of the Act states that the USRA shall provide loans to Conrail and acquiring railroads to compensate for, inter alia, payments made pursuant to § 709(b). The United States and the USRA, however, part company with Conrail and Amtrak on the question of reimbursement, maintaining that the loan payment and reimbursement provisions of § 211(h) were intended only as short-term measures, expedients whose time has passed. The employee claimants argue that Conrail and Amtrak are liable under § 709(b), whether or not Conrail and Amtrak are entitled to reimbursement under § 211(h). Reading and Erie urge that regardless of whether Conrail and Amtrak are liable to the employee claimants under § 709(b), that inasmuch as the railroads have been discharged in bankruptcy, Conrail, Amtrak, and the USRA cannot seek subsequent reimbursement from them.

* * *
Conrail and Amtrak specifically assert that § 709(b) is facially inapplicable to the underlying tort claims of the employee claimants. We agree.
Section 709(b), by its own terms, establishes two threshold requirements for its application. The first sentence of § 709(b) expressly provides that Conrail, or an acquiring railroad shall assume only those "cases or claims ... against a railroad in *1323 reorganization ... arising prior to the date of conveyance of rail properties...."
The Rail Act defines a "railroad in reorganization" as:
a railroad which is subject to a bankruptcy proceeding and which has not been determined by a court to be reorganizable or not subject to reorganization pursuant to this chapter as prescribed in section 207(b) of this Act [45 U.S.C. § 717(b)]. A "bankruptcy proceeding" includes a proceeding pursuant to section 77 of the Bankruptcy Act (11 U.S.C. § 205) and an equity receivership or equivalent proceeding.
Section 102(16) of the Rail Act, 45 U.S.C. § 702(16).
The predecessor railroads of Conrail and Amtrak that employed the employee claimants have undergone reorganization, final consummation orders have been entered, and each railroad has been discharged in bankruptcy.[2] Hence, none of the railroads in question are any longer "subject to a bankruptcy proceeding", nor were any of them subject to such proceedings at the time the underlying tort claims were first asserted.
No party has suggested any authority to support a contrary interpretation of "a railroad in reorganization". Nor does any party dispute the fact that the railroads involved in this litigation are no longer subject to bankruptcy proceedings.
Where, as is the case here, the definition of a statutory term is clear and unequivocal it is controlling. Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985); N. Singer, 1 Sutherland Stat. Const. § 27.02 (Sands 4th ed. 1985). See id. § 47.07.[3] Furthermore, this view of § 709(b) as having only limited applicability, in general, and no application under the circumstances of these cases, is supported by a review of the reimbursement provisions of that section. Section 709(b) specifies that any damages paid out by Conrail are subject to reimbursement "from the estate of the railroad in reorganization." Obviously, this scheme contemplates the existence of such "estates". Where, as is the case here, the railroads have been discharged in bankruptcy and no such "estates" remain, the scheme envisioned by Congress can not be effectuated.
This express requirement of § 709(b) is dispositive of the question of whether the subject personal injury claims can be brought against Conrail and Amtrak under that section, and inasmuch as it appears that none of the railroads in these cases fit within § 102(16)'s definition, we conclude that Conrail and Amtrak cannot be held liable under that section for such claims. Thus, we need not determine whether these claims or cases "[arose] prior to the date of conveyance of rail properties ...", or consider whether the United States and the USRA have any duty to reimburse Conrail and Amtrak. By the same token, § 709(b) has no effect on the determination of any obligations of the former rail entities in these cases.

IV. Preemption

Conrail, having convinced the court that § 709(b) is no weapon for the individual plaintiffs in their fight for damages, would now have us declare it an impenetrable shield against any claims of liability. We are urged to recognize § 709(b), in the context of the whole Act, as a preemptive strike against any attempt to pin liability on Conrail under any theory of tort law. Specifically, the claim is that § 709(b) insulates Conrail from common law successor tort liability, thereby barring employees of the bankrupt railroads from pressing FELA claims against it.

*1324 A. Jurisdiction to Determine Preemptive Effect

Reading and Erie contend that this court lacks jurisdiction to determine the question of § 709(b)'s preemptive effect. The plaintiffs in C.A. No. 85-2, while not contesting the court's jurisdiction, suggest that any decision by the court on the question of Conrail's common law successor liability would be premature.
This court's jurisdiction is established by § 1152(a) of NRSA, which provides, in pertinent part:
Notwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action 
(1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision of or amendment made by this subtitle, or administrative action taken thereunder to the extent such action is subject to judicial review.
45 U.S.C. § 1105(a).
Conrail seeks a declaration from this court that § 709(b) preempts common law tort principles as they might apply to these cases. Conrail argues that the question of § 709(b)'s residual preemptive effect, if any, is a matter suitable for "declaratory ... relief", as it is one that "relat[es] to the enforcement ... or interpretation" of a NRSA provision.
An interpretation of the preemptive effect of § 709(b), or any other section added to the Rail Act by NRSA, falls within the literal purview of jurisdiction conferred on this court by § 1152(a)(1). In the context of these cases, the determination of that question is one "which has the potential for significantly effecting implementation of [NRSA]". Consolidated Rail Corporation v. County of Monroe, 558 F.Supp. 1387, 1390 (Sp.Ct.R.R.R.A.1983). Conrail and Amtrak urge the court to go farther and assume jurisdiction to determine whether the overall federal regulatory scheme embodied in the Rail Act precludes any imposition of successor liability. This court's jurisdiction over provisions of the Rail Act, other than those provisions added or amended by NRSA, is found in § 209(e) of the Rail Act. The § 209(e) jurisdiction is more circumscribed than the jurisdiction found in § 1152(a) of NRSA. As we have held, § 209(e)(1) does not confer jurisdiction over every suit requiring an interpretation of the Rail Act. There must be a challenge to an action or inaction of USRA or to a provision of the Rail Act itself. Prairie Central Ry. v. Illinois Central Gulf RR., 564 F.Supp. 385 (Sp.Ct. R.R.R.A.1983). The other provisions of § 209(e) are inapplicable to these cases.[4] *1325 Conrail and Amtrak are not challenging the Rail Act but seeking a declaration that the overall purpose of the Act, to establish an economically viable freight railroad in the region, is jeopardized by the possibility of imposing common law successor liability on Conrail. This may be so, but it is not within our exclusive jurisdiction to determine. We must limit our decision to those questions which fit squarely within our § 1152(a)(1) jurisdiction, that is, the preemptive effect of § 709(b) or other provisions of NRSA.

B. Basic Principles

The principle is well-established that the Supremacy Clause, U.S. Const., Art. VI, cl. 2[5] invalidates state laws[6] that "interfere with, or are contrary to, federal law." Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting Gibbons v. Ogden, 22 U.S. [9 Wheat.] 1, 211, 6 L.Ed. 23 (1824)).[7]
Federal legislation may preempt state law in three ways.
First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. E.g. Shaw v. Delta Air Lines, 463 U.S. 85 [103 S.Ct. 2890, 77 L.Ed.2d 490] (1983). Second, even in the absence of express preemptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. E.g., Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] (1982); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248] (1963), or when the state law "stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).
Michigan Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Board, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).[8]
*1326 While "[n]o simple formula can capture the complexities" of preemption doctrine, Goldstein v. California, 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1973),[9] a few general principles are articulable. First, the intent of Congress in enacting the federal statute is the "ultimate touchstone" for determining the statute's preemptive scope. Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963).[10] Therefore, our primary task is to "`ascertain Congress' intent'", Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985) (quoting Shaw, 463 U.S. at 95, 103 S.Ct. at 2899).
Second, there is a general presumption against preemption. Metropolitan Life, 105 S.Ct. at 2390.[11] The "exercise of federal supremacy is not lightly to be presumed," Schwartz v. Texas, 344 U.S. 199, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952) and will not be found in "`the absence of persuasive reasons  either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.'" Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981).[12]
Considerations of federalism also dictate that where we are uncertain about Congress' intent we should hesitate to find preemption. Penn Dairies v. Milk Control Comm'n, 318 U.S. 261, 275, 63 S.Ct. 617, 623, 87 L.Ed. 748 (1943). Thus, the presumption against preemption "provides assurance that `the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts." Jones v. Rath, 430 U.S. at 525, 97 S.Ct. at 1309 (citation omitted).
Another reason for such caution is that Congress has the undoubted ability to "act so unequivocally as to make it clear it intends no regulation but its own." Rice v. Santa Fe, 331 U.S. at 236, 67 S.Ct. at 1155. Given the "basic assumption that Congress did not intend to displace state law", Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981),[13] we are admonished to construe the statute in question so as to avoid preemption. Metropolitan Life, 105 S.Ct. at 2390.
The third basic principle is that state laws of general applicability are less subject to preemption than are state laws specifically designed to regulate particular types of nongovernmental activities. New York Telephone Co. v. New York State Dept. of Labor, 440 U.S. 519, 533, 99 S.Ct. 1328, 1337, 59 L.Ed.2d 553 (1970) (plurality opinion). Although there is no guarantee that state laws of general applicability are exempt from preemption, Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 193 and n. 22, 98 S.Ct. 1745, 1755 and n. 22, 56 L.Ed.2d 209 (1978); Farmer v. Carpenters, 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1977), deference is commonly accorded general state laws of a particular type  those "that protect interests `deeply rooted in local feeling and responsibility.' With respect to such laws, [the Supreme Court has] stated `that in the absence of compelling congressional direction, we [can] not infer that Congress ha[s] deprived the states of the power to act.'" New *1327 York Telephone, 440 U.S. at 540, 99 S.Ct. at 1341 (quoting San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)).[14]
The fourth fundamental principle follows directly from the third:
[w]here ... the field that Congress is said to have preempted has traditionally been occupied by the States "`we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"
Hillsborough County, 105 S.Ct. at 2376 (quoting Jones v. Rath, 430 U.S. at 525, 97 S.Ct. at 1309; quoting Rice v. Santa Fe, 331 U.S. at 230, 67 S.Ct. at 1152).[15]
Furthermore, this specific presumption against preempting a state's exercise of its traditional police powers is especially strong regarding laws that protect the health and safety of a state's citizens; such laws are "those `the Court has been most reluctant to invalidate.'" Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (plurality opinion) (quoting Raymond Motor Transportation, Inc. v. Rich, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978)). See Hillsborough County, 105 S.Ct. at 2376; Metropolitan Life, 105 S.Ct. at 2398; Silkwood v. Kerr-McGee, Corp., 464 U.S. 238, 250-51, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984); United Construction Workers v. Laburnum Corp., 347 U.S. 656, 665, 74 S.Ct. 833, 838, 98 L.Ed. 1025 (1954).[16]
Fifth and finally, the burden of demonstrating preemption is on the party who seeks its adoption. Silkwood, 464 U.S. at 255, 104 S.Ct. at 625. Under ordinary circumstances that burden is a formidable one. See Motor and Equipment Manufacturers Ass'n v. Environmental Protection Agency, 627 F.2d 1095, 1107 n. 20 (D.C.Cir.), cert. denied sub. nom. General Motors Corp. v. Costle, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). See also Florida Lime, 373 U.S. at 146-47, 83 S.Ct. at 1219-20.
These principles, particularly the strong presumption against preemption, are serious obstacles to the success of Conrail's and Amtrak's argument.

* * *
Conrail asserts that there are two basic reasons why this court should hold that common law principles of successor liability are preempted. The first is that in enacting § 711 of NRSA, 45 U.S.C. § 797j, Congress expressly precluded the application of such common law principles. The second reason is that § 709(b), when considered within the context of the structure and purpose of the Rail Act as a whole, reflects Congress' implied intent to preclude such application.

C. Express Preemption

Conrail's express preemption argument turns on its interpretation of § 711 of NRSA, which states:

*1328 No State may adopt or continue in force any law, rule, regulation, order, or standard requiring [Conrail or Amtrak] to employ any specified number of persons to perform any particular task, function, or operation, or requiring [Conrail] to pay protective benefits to employees, and no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.
45 U.S.C. § 797j.
Conrail contends that since both § 711 and § 709(b) are contained in Title VII of the Rail Act and since the heading of that title reads "Protection of Employees", the right to sue for redress of personal injuries embodied in § 709(b) must be construed as a "protective benefit", a benefit that states may not confer or enforce. Conrail's Supp. Mem. at 43 (Nov. 8, 1985).[17]
In interpreting the Rail Act "we have no choice but to `begin with the language employed by Congress and the assumption that the ordinary meaning of that language expresses the legislative purpose.'" Metropolitan Life, 105 S.Ct. at 2389 (quoting Park 'n Fly, 105 S.Ct. at 662). The ordinary meaning of "protective benefits" can hardly be said to include the right to sue in tort for personal injuries. Moreover, Conrail has not identified, nor have we found, any language in the Rail Act or any discussion in its legislative history that shows that Congress comprehended or intended such an expanded notion of that phrase.
Nor are we persuaded by the fact that § 709(b) is within a title entitled "Protection of Employees". Propinquity does not warrant preemption. "Titles do not control meaning; preambles do not change language." K. Llewellyn, The Common Law Tradition: Deciding Appeals  Appendix C, "Canons on Statutes" 524 (1960); see N. Singer, 3 Sutherland Stat. Const. §§ 47.03, 47.14 (Sands 4th ed. 1984).
Obviously employees can be protected by both benefits and rights, without rights meaning the same thing as, or being subsumed under, benefits. In this context, benefits are a matter of entitlement, available to all members of a class, such as "[f]inancial assistance received in time of sickness, disability, unemployment, etc. either from insurance or public programs such as social security." Black's Law Dictionary 143 (rev. 5th ed. 1979). By contrast, a right of action "pertains to remedy or relief through judicial procedure, ... the legal right to maintain an action growing out of a given transaction or state of facts and based thereon." Id. at 1190. See also "cause of action", id. at 201.
That Congress well understood this distinction between benefits and rights of action is demonstrated by other sections of Title VII, sections which far more comfortably fit within the rubric of "protective benefits to employees". For example, § 701(b), 45 U.S.C. § 797(b), states that government funds may be provided for, inter alia:
(1) Allowances to employees deprived of employment.
(2) Moving expenses for employees who must make a change in residence.
(3) Retraining expenses for employees who are seeking employment in new areas.
(4) Termination allowances for employees.
(5) Health and welfare insurance premiums.[18]
The legislative history cited by Conrail not only does not support its contention *1329 that the right to pursue a cause of action for personal injury is merely another employee "benefit", but actually undermines it. To be sure, as Conrail has noted, the Senate Report on the Northeast Rail Service Act of 1981, which added §§ 709 and 711 to the Rail Act, criticized the employee protective benefits provided by the "3-R Act ... as the most expensive labor protection provision in labor history." S.Rep. No. 101, 97th Cong., 1st Sess., 10 (May 15, 1981). But the Senate Report's discussion of that program identifies these financially burdensome benefits as "monthly dismissal allowance[s]", "monthly allowances" for "[d]isplaced employees", and "separation allowance[s]." Id. The Senate Report simply makes no mention of causes of action brought under FELA as a "benefit". Nor is there any other evidence that § 711's use of "protective benefits" was intended to include such causes of action.
Most importantly, other provisions of the Rail Act illustrate that Congress knew how to bar the application of state or federal law, and when it so chose used language that left no room for ambiguity or uncertainty.[19]
In light of the foregoing we must reject Conrail's argument that § 711 expressly preempts common law successor liability.

D. Implied Preemption

Conrail raises three arguments in favor of implied preemption of common law successor liability. First, federal rail legislation is so "pervasive" that it demonstrates that Congress occupied the field to the exclusion of any concurrent state regulation. Second, the federal interest in establishing an economically viable Conrail is so "dominant" that it precludes the application of state tort law. Third, state tort law would "frustrate" the Congress' goal of creating an economically viable Conrail. We consider each in turn.

1. "Pervasive Federal Regulation"

Conrail contends that "[t]hrough the Rail Act, the 4-R Act, RTIA, the Staggers Act, and NRSA" Congress created a legislative scheme that is so "extraordinarily comprehensive" that it is difficult to infer that "Congress left any room for state actions to supplement ... the far-ranging federal scheme." Conrail's Supp.Mem. at 48-49. Since "Congress intended to occupy the field of reorganization of our bankrupt railroads .... [c]ommon law successor liability has no place...." Id. at 50.
The chief obstacle to Conrail's argument is the Supreme Court's repeated statements that the pervasive nature of federal regulation, standing alone, cannot be used to prove a congressional intent to occupy an entire field and is therefore insufficient to preempt all state law that concerns the subject matter of the federal scheme. Hillsborough County, 105 S.Ct. at 2377; New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973).[20]
We also note that although the scheme of federal regulation embodied in the Rail Act and its companion legislation is undoubtedly comprehensive, this scheme can hardly be said to be more pervasive than the "comprehensive amalgam of [federal] substantive law and regulatory arrangements" that concerns labor-management relations, Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 675, 103 S.Ct. 1453, 1458, 75 L.Ed.2d *1330 368 (1983), or the detailed and interwoven federal legislation that concerns nuclear power. Yet in both these areas the Court has consistently refused to infer that all related state laws are preempted. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985) (labor law); Brown v. Hotel and Restaurant Employees, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984) (labor law); Pacific Gas & Electric, supra (nuclear power); Silkwood, supra (nuclear power).[21]
We do not question that the Rail Act and subsequent legislation did create a comprehensive federal scheme designed to revitalize freight railroads in the region. Whether that scheme evidences an intent to preclude imposition of successor liability on Conrail is not for this court to determine. We must look to § 709(b) and NRSA.
The legislative history of § 709(b) and its companion provision, § 211(h)(1)(A), 45 U.S.C. § 721(h)(1)(A),[22] demonstrates that they were designed to function solely as a temporary stop-gap or housekeeping device, as an administrative and procedural mechanism intended to ensure that employee personal injury claims would be expeditiously handled during the transformation of the bankrupt railroads into Conrail, and not as a substantive provision creating, defining, or limiting rights and remedies. Conrail concedes as much. "[W]hile Conrail was required initially to meet certain obligations of the railroads in reorganization ... it was to do so simply as a device for preserving continuity during the period of conveyance...." Conrail's Supp.Mem. at 31. Congress evidently hoped that by providing for the prompt and full compensation of employee personal injury claims employee anger and disaffection would be minimized, which, in turn, would reduce the potential for disruption of Conrail's operations during the crucial period of its inauguration as a railroad.
The purpose of [§ 211(h)] was to provide a mechanism for effecting a smooth transition from the rail operations of the bankrupt railroads to ConRail and other profitable carriers in accordance with the final system plan. The loans were designed to preclude disruptions in rail operations due to the inability of the bankrupt estates to currently meet their obligations to employees, shippers, other railroads, and suppliers for materials and services rendered immediately prior to conveyance on April 1, 1976. It was clear that the claimants would probably react against ConRail and the other acquiring carriers if their unpaid claims were not timely paid because they were left with the estates to be individually collected through the reorganization courts.
Report of the [House] Comm. on Interstate and Foreign Commerce on the Rail Amendments of 1976, H.R.Rep. No. 94-1479, 94th Cong., 2d Sess. at 14 (Sept. 8, 1976).[23]
By contrast, the overwhelming majority of the provisions enacted by the Rail Act and its companion legislation focused on the creation of Conrail as a functioning railroad. Aside from the stop-gap mechanism of § 709(b), Congress simply did not *1331 address the issue of how the former employees of the bankrupt railroads were to seek redress for injuries sustained prior to the creation of Conrail. In sum, what Conrail characterizes as "pervasive federal regulation" is insufficiently comprehensive to support an inference that Congress intended all state tort law to be preempted.

2. "Dominant Federal Interest"

"Preemption of a whole field ... will be inferred where the field is one in which `the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Hillsborough County, 105 S.Ct. at 2375 (quoting Rice v. Santa Fe, 331 U.S. at 230, 67 S.Ct. at 1152); See Hines, 312 U.S. at 52, 61 S.Ct. at 399.
Conrail contends that the federal interest in establishing Conrail as an economically viable railroad is so dominant as to require the preclusion of "state-law principles of successor liability." Conrail's Supp.Mem. at 52.
We are unpersuaded by this argument. Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law. Neither does the Supremacy Clause require us to rank congressional enactments in order of "importance" and hold that, for those at the top of the scale, federal regulation must be exclusive.
Hillsborough County, 105 S.Ct. at 2378.
Consequently, the mere existence of a federal interest, however strong or important it may seem at first glance, cannot justify preemption. Rather we are admonished to look for "special features warranting preemption." Id.
The Supreme Court has provided clear standards in this area. For example, the regulation of foreign affairs is a paradigmatic "dominant interest", one "intimately blended and intertwined with the responsibilities of national government." Hines v. Davidowitz, 312 U.S. at 66, 61 S.Ct. at 403. See Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956). State tort law is not the sort of regulation that encroaches on subjects that are essentially national in character, or subjects that are reserved by the Constitution as solely the province of the federal government. To the contrary, as the Hillsborough County Court observed in rejecting a preemption claim based on an asserted dominant federal interest, "the regulation of health and safety matters is primarily, and historically, a matter of local concern." 105 S.Ct. at 2378.

3. "Inconsistency with Federal Objectives"

Conrail's final argument is that allowing a state to apply common law successor liability principles "would permit[] an unpredictable but large influx of liability claims," which "would drain Conrail financially and thereby interfere with the congressionally [sic] objectives" of creating an economically viable rail system. Conrail's Supp.Mem. at 53, 54. Thus, "the state common law of successor liability `stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.'" Id. at 53 (quoting Hines, 312 U.S. at 67, 61 S.Ct. at 404).
There is no doubt that Congress intended to create a viable rail system. Section 101(b)(2) of the Rail Act, 45 U.S.C. § 701(b)(2). Nor is there any question that Congress sought to insulate Conrail from certain liabilities, and also in enacting NRSA sought to reduce the expense of employee benefit programs. Section 1144(a)(1) of NRSA repealed the employee protection provisions of Title V of the Rail Act and § 1143(a) substituted a new Title VII which was substantially less generous to employees. For example, § 702 enabled Conrail to reduce the number of employees substantially and provided a substantially lower level of labor protection benefits to the terminated employees. See United Transp. Union v. Consolidated Rail *1332 Corp., 535 F.Supp. 697 (Sp.Ct.R.R.R.A. 1982). However, these provisions do more than demonstrate Congress' intent to limit sources of financial burden. The fact that Congress listed and expressly limited some burdens suggests that this court should be wary of expanding that list simply on the basis of Congress' silence.
The principal problem with Conrail's argument is that there is just no indication that Congress regarded the possibility of successor tort liability to be an obstacle to Conrail's continued operations, unlike Congress' explicit finding that the crippling burden of employee protective benefits posed an obstacle to the purposes of the Rail Act, see NRSA § 1132(4), 45 U.S.C. § 1101(4). In sum, we are asked to find preemption on the basis of Conrail's speculation about the danger of an "unpredictable but large influx of liability claims," Conrail's Supp.Mem. at 53, a conjecture that Conrail has not supported by any facts, and a danger that Congress never saw fit to mention.
Conrail's argument sweeps too broadly, as it presupposes that every difference in purpose between federal and state law is tantamount to a conflict in purpose. This argument would require the preemption of every state law that did not precisely conform to the relevant federal laws. Given the varied, multiple, and ofttimes ambiguous purposes of congressional enactments, few state laws could withstand a preemption challenge.
Our proper concern is not whether the federal and state laws have different purposes or whether they are potentially in conflict, but whether the exercise of concurrent federal and state jurisdiction in a related area presents an "irreconcilable" and "inevitable" conflict. Florida Lime, 373 U.S. 142-43, 83 S.Ct. at 1217-18.
Accommodation between federal and state laws, not preemption by the former over the latter, is the preferred solution.
In situations where federal and local enactments overlap in their effect on nongovernmental activities, the Supreme Court has consistently reminded us that, to the extent possible, "the proper approach is to reconcile `the operation of both statutory schemes with one another rather than holding one completely ousted.'"
Don't Tear It Down v. Pennsylvania Avenue Development Corp., 642 F.2d 527, 534 (D.C.Cir.1980) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 127, 94 S.Ct. 383, 390, 38 L.Ed.2d 348 (1973) (quoting Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)).[24]
In determining whether an irreconcilable and inevitable conflict exists, and whether the principles of preemption require that state law yield to subordinating federal legislation, we must examine whether there exists "potential conflict of rules of law, of remedy, and of administration." Garmon, 359 U.S. at 242, 79 S.Ct. at 778.[25] Here there is no danger of such conflicts. First, there are no federal administrative agencies that superintend, or any federal rules of law that cover, the disposition of the underlying personal injury claims. Thus, these cases are readily distinguishable from those where preemption has been found necessary. See e.g. Transcontinental Gas Pipe v. State Oil and Gas Board, 474 U.S. 409, 106 S.Ct. 709, 717, 88 L.Ed.2d 732 (1986) (state regulation disturbs uniform scheme of federal energy regulation); Ray v. Atlantic Richfield, 435 U.S. at 165, 98 S.Ct. at 998 (state ship construction standards in direct conflict with uniform federal construction standards); id. at 161, 163, 168, 98 S.Ct. at 996, *1333 997, 999; City of Burbank, 411 U.S. at 639, 93 S.Ct. at 1862 (local airport noise control rules in conflict with standards established by a federal administrative agency); Metropolitan Life, 105 S.Ct. at 2394; Vaca v. Sipes, 386 U.S. 171, 178-79, 87 S.Ct. 903, 910-11, 17 L.Ed.2d 842 (1967), and Garmon, 359 U.S. at 242, 79 S.Ct. at 778 (federal labor law preemption grounded on the need to protect the "primary jurisdiction" of the National Labor Relations Board).
Second, there is no danger of a conflict in remedies. Indeed, far from the existence of two distinct and different remedial systems, there is but one remedy, and a federal one at that. See Wisconsin Dept. of Industry v. Gould, Inc., ___ U.S. ___, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986); Exxon Corp. v. Hunt, 106 S.Ct. at 1116. The employee claimants seek to pursue actions in state courts, on the basis of a federal law, FELA, which itself derives its substantive principles from state common law.
Ultimately Conrail's financial burden argument proves too much, as it would logically mandate the preemption of all state laws that add costs to the operation of the railroad. Conrail's contentions regarding "pervasive regulation" and "dominant interest" are unconvincing; so too is its "frustration of federal purpose" argument.
In the final analysis we are bound by Congress' intent. Although the legislative history of § 709(b) makes clear that the liability for "[a]ll cases or claims ... for personal injury ... against a railroad in reorganization ..." was ultimately to be borne by the railroads in reorganization, both NRSA and its legislative history are completely silent with respect to who should assume liability for claims for occupational injuries which did not manifest themselves until after the bankrupt railroads had been reorganized and were no longer "railroads in reorganization," that is to say claims not subject to § 709(b).
We must assume that Congress knew that railroad workers were susceptible to latent occupational diseases which might not manifest themselves until after the bankrupt railroads had been reorganized and discharged in bankruptcy;[26] and that it also knew that such workers would not be able to avail themselves of the unique opportunities provided by § 709(b). However, Congress' failure to make specific provisions for these employees in the Rail Act[27] can hardly be interpreted as a determination that they be bereft of any otherwise available remedy. There is no discernible reason to suppose that the same Congress which expressly provided that workers who had the opportunity to bring FELA claims for preconveyance injuries prior to the consummation of bankruptcy proceedings would be entitled to full and expedited relief intended, sub silentio, to foreclose any available remedy from those workers who did not (and through no fault of their own could not) file identical claims until after their former employers had been discharged in bankruptcy. At any rate we find no basis for inferring such congressional intent.
We believe that in these cases § 709(b) is neither a sword for the employee claimants nor a shield for Conrail and Amtrak. We therefore hold that: (1) § 709(b) affords no separate basis for recovery of civil damages by the employee claimants; and (2) § 709 has no preemptive effect on these cases.
An appropriate order is attached.
NOTES
[1] Section 709(b) is virtually identical to former § 504(g) (45 U.S.C. § 774(g) (repealed 1981)). Section 709(b) was enacted in 1981 by the Northeast Rail Service Act of 1981, § 1143(a), Act of August 13, 1981, Pub.L. 97-35, Title XI, Subtitle E, Part 3, 95 Stat. 666, simultaneously with the repeal (NRSA § 1144(a)(1)) of § 504(g), which had first been enacted as § 618 of the Rail Revitalization and Regulatory Reform Act of 1976 ("4R Act"), Act of February 5, 1976, Pub.L. 94-210, Title VI, § 615, 90 Stat. 113.
[2] The consummation dates for the various bankrupt railroads were: Erie  November 30, 1982; Reading  December 31, 1980; Penn Central  October 24, 1978; Lehigh ValleySeptember 1, 1982; Central of New JerseySeptember 14, 1979.
[3] See also Park 'n Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985); Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983).
[4] Section 209(e) states, in pertinent part:

(e) ORIGINAL AND EXCLUSIVE JURISDICTION.  (1) Notwithstanding any other provision of law, any civil action 
(A) for injunctive or other relief against the Association from the enforcement, operation, or execution of this Act or any provision thereof, or from any action taken by the Association pursuant to authority conferred or purportedly conferred under this Act;
(B) challenging the constitutionality of this Act or any provision thereof;
(C) challenging the legality of any action of the Association, or any failure of the Association to take any action, pursuant to authority conferred or purportedly conferred under this Act;
(D) to obtain, inspect, copy, or review any document in the possession or control of the Association that would be discoverable in litigation pursuant to section 303(c) of this Act;
(E) brought after a conveyance, pursuant to section 303(b) of this Act, to set aside or annul such conveyance or to secure in any way the reconveyance of any rail properties so conveyed; or
(F) with respect to continuing reorganization and supplemental transactions, in accordance with section 305 of this Act;
shall be within the original and exclusive jurisdiction of the special court. The special court shall not hear or determine any such action prior to the date of conveyance, pursuant to section 303(b)(1) of this Act, except as the Constitution may require. Relief shall not be granted in any action referred to in subparagraph (A)(C), or (E) unless the person seeking such relief establishes that the Association acted in reckless or deliberate disregard of applicable law.
(2) The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court.
[5] The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... are the supreme Law of the Land ... any Thing in the Constitution of Laws of any State to the Contrary notwithstanding."
[6] Congressional authority to preempt the power of the states applies equally to statutes and the common law. See Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); Sperry v. Florida, 373 U.S. 379, 403, 83 S.Ct. 1322, 1335, 10 L.Ed.2d 428 (1963).
[7] See Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981); McCullouch v. Maryland, 17 U.S. [4 Wheat.] 316, 427, 4 L.Ed. 579 (1819).
[8] See Pacific Gas & Electric Co. v. State Energy Resources and Conservation Development Comm'n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1721-22, 75 L.Ed.2d 752 (1983); Ray v. Atlantic Richfield Co., 435 U.S. 151, 157-58, 98 S.Ct. 988, 994-95, 55 L.Ed.2d 179 (1978). See also Louisiana Public Service Commission v. Federal Communications Commission, ___ U.S. ___, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); Exxon Corp. v. Hunt, ___ U.S. ___, 106 S.Ct. 1103, 1109, 89 L.Ed.2d 364 (1986).
[9] See City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973).
[10] See Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985); Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978).
[11] See id., 105 S.Ct. at 2393; New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 413, 93 S.Ct. 2507, 2512, 37 L.Ed.2d 688 (1973).
[12] See Jones v. Rath Packing Co., 430 U.S. 519, 525-26, 97 S.Ct. 1305, 1309-10, 51 L.Ed.2d 604 (1977); Rice v. Santa Fe, 331 U.S. at 230, 67 S.Ct. at 1152; Hines v. Davidowitz, 312 U.S. at 61-62, 61 S.Ct. at 401-402.
[13] See Rice v. Santa Fe, 321 U.S. at 230, 67 S.Ct. at 1152.
[14] See id. 440 U.S. at 535, 99 S.Ct. at 1338; Belknap, Inc. v. Hale, 463 U.S. 491, 497-98, 509-10, 103 S.Ct. 3172, 3176-77, 3182-83, 77 L.Ed.2d 798 (1983); Sears, 436 U.S. at 193, n. 22, 98 S.Ct. at 1755, n. 22; Farmer, 430 U.S. at 296-97, 97 S.Ct. at 1061-62.
[15] See Metropolitan Life, 105 S.Ct. at 2389; Pacific Gas & Electric, 461 U.S. at 206, 103 S.Ct. at 1723; Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981); id., at 681 n. 1, 101 S.Ct. at 1321 n. 1 (Brennan, J., concurring in judgment); id., at 691, 101 S.Ct. at 1326 (Rehnquist, J., dissenting); Ray v. Atlantic Richfield, 435 U.S. at 158, 98 S.Ct. at 994.
[16] See also Note, "A Framework for Preemption Analysis", 88 Yale L.J., 363, 374 (1978) ("Traditional protection of vital interests ... is the category that is most impervious to preemption. If state laws protect people mostly inside the state from physical injury, they have been upheld even if they substantially hinder conduct that appears to be necessary to achieve a central purpose of national law."); Ferebee v. Chevron Chemical Co., 736 F.2d 1529, 1542 (D.C.Cir. 1984), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) ("The provision of tort remedies to compensate for personal injuries `is a subject matter of the kind [the] Court has traditionally regarded as properly within the scope of state superintendence.'" (quoting Florida Lime, 373 U.S. at 144, 83 S.Ct. at 1218)).
[17] "[S]ince § 709(b) is a part of a Title which generally addresses the protection of employees", "Congress must have intended not only to preempt state law which requires Conrail to employ a specific number of people to perform specific tasks, but also to preempt all state laws which would require Conrail to pay protective benefits to employees", such as those incorporated in section 709(b). Id.
[18] Cf. § 702 of the Rail Act, 45 U.S.C. § 797a  "Termination Allowance"; § 703, 45 U.S.C. § 797b  "Preferential Hiring"; and § 704, 45 U.S.C. § 797c  "Central Register of Railroad Employment."
[19] See, e.g. § 601(a)(2) of the Rail Act, 45 U.S.C. § 791(a)(2) ("The antitrust laws are inapplicable...."); § 601(b)(1) of the Rail Act, 45 U.S.C. § 791(b)(1) ("The provisions of the Interstate Commerce Act ... and the Bankruptcy Act ... are inapplicable...."); § 601(c) of the Rail Act, 45 U.S.C. § 791(c) (The environmental regulations of "section 4332(2)(C) of Title 42 shall not apply...."); NRSA § 1153(a)(1), 45 U.S.C. § 1106(a)(1) ("All transfers or conveyances of any interest in rail property ... shall be exempt from any taxes ... imposed by the United States or by any State...."). See also, Note, "A Framework for Preemption Analysis", 88 Yale L.J., 363, 364-65 and nn. 4-5 (1978).
[20] See Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 491 (9th Cir.1984), cert. denied sub nom. Chevron U.S.A., Inc. v. Sheffield, 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985); Motor and Equipment Manufacturers, 627 F.2d 1107 n. 20.
[21] See Motor Coach Employees v. Lockridge, 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473 (1971) (labor law); Garner v. Teamsters, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953) (labor law).
[22] Section 211(h)(1)(A) reads, in pertinent part:

The [United States Rail] Association is authorized ... to enter into loan agreements ... with [Conrail] ... under which [Conrail] ... will agree to meet existing or prospective obligations of the railroads in reorganization in the region ... in order to avoid disruptions in ordinary business relationships. Such obligations shall be limited to 
....
(v) claims of all employees or their personal representatives for personal injuries or death and subject to the provisions of [Federal] Employers' Liability Act (45 U.S.C. § 51-60).
[23] See id. at 15-16. See also Report of the Comm. of the Conference on the Railroad Revitalization and Regulatory Reform Act of 1976, H.R.Rep. No. 94-781, 94th Cong., 2d Sess. at 140, 192-93 (Feb. 13, 1976); Joint Explanatory Statement of the Comm. of the Conference, H.R. Rep. No. 94-1743, 94th Cong., 2d Sess. at 31-35, 41 (Sept. 30, 1976) reprinted in [1976] U.S.Code Cong. & Ad.News 5846, 5854-58, 5864.
[24] See Louisiana Public Service Commission v. Federal Communications Commission, ___ U.S. ___, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986); Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 132, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978); De Canas v. Bica, 424 U.S. 351, 357-58 n. 5, 96 S.Ct. 933, 397 n. 5, 47 L.Ed.2d 43 (1973); Dublino, 413 U.S. at 413-14, 93 S.Ct. at 2512-13; Goldstein v. California, 412 U.S. at 567-69, 93 S.Ct. at 2315-16.
[25] See Local 926, 460 U.S. at 676-77, 103 S.Ct. at 1458-59; Sears, 436 U.S. at 188-89, 98 S.Ct. at 1752-53; Farmer, 430 U.S. at 297, 97 S.Ct. at 1061; Lockridge, 403 U.S. at 285-86, 91 S.Ct. at 1917-18.
[26] Cannon v. University of Chicago, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979); See Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (holding that FELA claims for latent occupational diseases may be filed upon "discovery" of the injury). See also 82 C.J.S. "Statutes" § 316 at 541-44 & nn. 88-92.
[27] Like many statutes, the Rail Act and its progeny contain "some internal inconsistencies, vague language, and areas of uncertainty. It is not a perfect puzzle into which all the pieces fit." Louisiana Public Service Commission v. Federal Communications Commission, ___ U.S. ___, 106 S.Ct. 1890, 1904, 90 L.Ed.2d 369 (1986).